UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                                                        :
PAUL BERNIER                                            :        3:18 CV 1633 (RMS)
                                                        :
V.                                                      :
                                                        :
ANDREW SAUL,                                            :
COMMISSIONER                                            :
OF SOCIAL SECURITY[1]                                   :        DATE: OCTOBER 18, 2019
                                                        :
------------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A
HEARING, AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff disability insurance benefits ["SSDI"] and Supplemental Security Income benefits ["SSI"].

I.  ADMINISTRATIVE PROCEEDINGS

On July 31, 2015, the plaintiff filed an application for SSI and SSDI, claiming that he has been disabled since November 17, 2014, due to diabetes, asthma, high cholesterol, and a back problem. (Certified Transcript of Administrative Proceedings, dated November 10, 2018 ["Tr."] 191-206; *see* Tr. 58). The plaintiff's applications were denied initially and upon reconsideration (Tr. 99-102, 111-28, 146-49; *see* Tr. 58-97), and on September 29, 2017, a hearing was held before ALJ Deirdre Horton, at which the plaintiff and a vocational expert testified. (Tr. 34-57). On July

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security. (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. 25(d). The Clerk of the Court shall amend the caption in this case as indicated above.

11, 2017, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 17-29). On August 9, 2018, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5).

On September 28, 2018, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on December 27, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge. (Doc. No. 16). This case was transferred accordingly. On February 1, 2019, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 17), with a brief (Doc. No. 17-1 ["Pl.'s Mem."]), exhibits (Doc. Nos. 17-2, 17-3), and Statement of Material Facts (Doc. 17-4) in support. On May 20, 2019, the defendant filed his Motion to Affirm (Doc. No. 20), with a brief in support (Doc. No. 20-1 ["Def.'s Mem."]).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 17) is *denied*, and the defendant's Motion to Affirm (Doc. No. 20) is *granted.*

II.     FACTUAL BACKGROUND

On the date of the hearing, the plaintiff was sixty-two years old, living alone in an apartment. (Tr. 38). The plaintiff completed his General Equivalency Diploma ["GED"] in 1971. (Tr. 230). He is a veteran; he received medical care through the Veteran's Administration at the Veteran's Medical Center in West Haven, Connecticut ["VA"]. (Tr. 40-41; *see also* Tr. 259, 268). The plaintiff suffered from asthma; he smoked "at least a pack a day[,]" and he had "constant" back pain that he described as "throbbing" and, at times, "sharp[]" but "not as severe[,]" and "not as bad[ ]" as the pain he had when he was bending. (Tr. 41, 51-52; *see* Tr. 928 (smoked one pack a day since age 17; "not interested in cutting back right now")).

At the time of the hearing, the plaintiff was working part-time, four hours a day, doing janitorial work through a job training program for people age 55 and older. (Tr. 43, 45-46). He reported that he had that job since November 2014 (Tr. 44); his employer knew he had back problems, so he allowed him to stop and rest every hour or so. (Tr. 44). Prior to working as a janitor, he worked at Walmart and for a company called United Furniture, both full-time, performing maintenance and janitorial work. (Tr. 46, 49-50). The plaintiff testified that, at the time of the hearing, he could no longer do that work because it involved too much bending. (Tr. 51). Additionally, the plaintiff worked as a tractor trailer driver, driving "all over the United States and Canada[,]" but lost his license after receiving "too many" speeding tickets because his boss "wouldn't fix the speedometer." (Tr. 39, 47, 51; *see* Tr. 239). When he was not working, the plaintiff "mostly [sat] and watch[ed] TV[,]" he cooked his own meals, mostly in the microwave, and he cleaned his apartment. (Tr. 45; *see* Tr. 240).

A vocational expert testified by telephone that the plaintiff's past work as a tractor trailer driver was "medium" work, his work as a janitor was "heavy" work, and his work as a cleaner, which is usually classified as "heavy" work, was performed at a level "less than light." (Tr. 54 (vocational expert's testimony that the plaintiff's description of his janitorial work is "actually . . .—well, less than light" as he was lifting less than ten pounds, "but [janitorial work is] classified as heavy."); *see* Tr. 27 (ALJ recited: "As he currently works, the janitorial job may, per the vocational testimony, sometimes be less than light.")). The vocational expert testified that a person limited to medium work but with the ability to frequently climb ramps and stairs, occasionally climb ladders and scaffolds, frequently balance, stoop, kneel or crouch, occasionally crawl, and avoid concentrated exposures to temperature extremes, humidity, vibrations and

respiratory irritants, could perform jobs as a laundry worker, dishwasher, and lumber sorter. (Tr. 54-55).

III.  THE ALJ'S DECISION

Following the five-step evaluation process,[2] the ALJ found that the plaintiff meets the insured status requirements through March 31, 2020 (Tr. 22), and that the plaintiff did not engage in substantial gainful activity since his alleged onset date of November 17, 2014. (Tr. 22-23, citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).

At step two, the ALJ found that the plaintiff had the following severe impairments: mild osteoarthritis in his lumbar spine; chronic obstructive pulmonary diseases ["COPD"], and obesity. (Tr. 23-24, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926. (Tr. 26-27). The ALJ concluded that the plaintiff had the residual functional capacity ["RFC"] to perform medium work as defined in 20 C.F.R. §§

---

[2] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

404.1567(c) and 416.967(c), with the ability to frequently climb ramps and stairs; occasionally climb ladders, ropes and scaffolds; frequently balance, stoop, kneel and crouch; and, occasionally crawl. (Tr. 25). Additionally, the ALJ found that the plaintiff must avoid concentrated exposure to temperature extremes, humidity, vibration, respiratory irritants such as dusts, fumes, gases and odors, and he must avoid hazardous machinery defined as fast moving parts and unprotected heights. (Tr. 25). At step four, the ALJ concluded that the plaintiff was unable to perform any past relevant work, and at step five, the ALJ found that the plaintiff could perform work as a "[l]aundry worker[,]" "[d]ishwasher," and "[l]umb[e]r sorter," which jobs exist in substantial numbers and "match the [plaintiff's] individual profile." (Tr. 28). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from November 17, 2014, through July 11, 2017, the date of the decision. (Tr. 29, citing 20 C.F.R. §§ 404.1520(f) and 416.920(f)).

IV. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and

conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V. <u>DISCUSSION</u>

The plaintiff argues that the ALJ (1) failed to obtain opinion evidence and left obvious gaps in the medical record; (2) did not properly formulate the plaintiff's RFC; (3) failed to consider the plaintiff's condition under the Medical-Vocational Guidelines; and (4) did not evaluate the demands and numbers of jobs available at step five. (Pl.'s Mem. at 2; *see id.* at 12-20).

    A.    <u>THE ALJ DID NOT ERR IN FAILING TO OBTAIN OPINION EVIDENCE, THERE ARE NO OBVIOUS GAPS IN THE RECORD, AND THE ALJ'S RFC ASSESSMENT IS SUPPORTED BY SUBSTANTIAL EVIDENCE</u>

In her decision, the ALJ concluded that the plaintiff retained the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except that he was limited to the following: frequently climbing stairs and ramps, occasionally climbing ladders, ropes and scaffolds, frequently balancing, stooping, kneeling and crouch, and occasionally crawling. (Tr. 25). Additionally, the ALJ concluded that the plaintiff must avoid concentrated exposure to temperature extremes, humidity, vibration, and respiratory irritants. (Tr. 25). The ALJ concluded also that the plaintiff must avoid hazardous machinery defined as fast moving parts and

unprotected heights. (Tr. 25). In support of this conclusion, the ALJ relied on treatment records from the Veterans' Medical Center in West Haven, Connecticut ["VA"] (Tr. 25-26), and the State agency medical consultant. (Tr. 24).

While the record is voluminous, there is a great deal of duplication. The plaintiff's back impairment is documented through several objective records, dating back to November 2014 when the plaintiff was seen at the VA for a "primary care consult[.]" (Tr. 402, 634). At that appointment, the plaintiff reported "[b]ack issues" which he just "[thought was] old age." (Tr. 402, 634). He "[thought the pain] goes down [the] back of [his] [right] leg, spine, [and it] comes and goes." (Tr. 402, 634). According to the plaintiff, however, he was "still able to do all work." (Tr. 402, 634; *see* Tr. 24). As the ALJ noted in her decision (Tr. 24), he reported that he did "lots of walking," and that he "[could] go up a flight of stairs but puffing[.]" (Tr. 403, 635). Radiology testing of the plaintiff's lumbar spine on November 24, 2014 revealed "mild osteoarthritic disease of the lumbar spine[.]" (Tr. 1023; *see* Tr. 316, 409-10, 432-33, 462-63, 500, 525, 678, 810). On February 24, 2015, the plaintiff reported that he thought he injured his back while working, but that he did not have pain on the date of the medical exam. (Tr. 587).

On March 18, 2015, the plaintiff reported hip pain radiating to his knee, which he felt at night when going to sleep. (Tr. 488, 578-79, 802). He took Tylenol but would wake around 2-3 a.m, with pain, although it was "[a]lways better in the morning and throughout the day." (Tr. 488, 579, 802).

On September 16, 2016, the plaintiff reported that he was doing "[a] lot of walking at work. Uses stairs sometimes to sweep them." (Tr. 935). He reported also that when he bends over or gets up from sitting, he feels "a discomfort in [his] left groin[.]" (Tr. 944). He described it as a "momentary discomfort," and he denied radiating pain or pain at any other time. (Tr. 944).

7

In addition to considering these medical records relating to the plaintiff's back pain, the ALJ weighed the plaintiff's testimony that he felt sore after going to his janitorial job for four hours a day. (Tr. 26; *see* Tr. 43). The ALJ, however, appropriately concluded that the plaintiff's activities, including his part-time job, supported her decision. (Tr. 26).

The plaintiff argues that his sleep apnea limited his ability to perform physically demanding tasks, but the medical evidence of record does not support this contention. The plaintiff was diagnosed with "mild obstructive sleep apnea[]" in 2014 (Tr. 363, 365; *see* Tr. 389, 516-19 (December 2014 Split Night Polysomnography Report); *see also* Tr. 514-15, 606-09), and on February 26, 2015, he was seen for a Sleep Medicine consult. (Tr. 366-67, 489-90, 580-81, 803-05). The plaintiff reported feeling "refreshed when he awakens[,]" and although he complained of "excessive daytime sleepiness[,]" he did not nap during the day. (*Id.*). The provider ordered a smaller mask for the plaintiff's CPAP machine after considering that the size of the mask may have been impeding the plaintiff's ability to benefit from its use (Tr. 367-68, 805), but, by May 2015, after the plaintiff had lost thirteen pounds in the previous three months, a follow up sleep study was suggested on the thought that the plaintiff "may no longer have [obstructive sleep apnea]" because of his "healthy life style" and weight loss. (Tr. 468, 558, 782; *see* Tr. 465-66, 556-58, 780-82)). As of August 10, 2015, the plaintiff was "pleased" to be told that he no longer needed to use a CPAP machine. (Tr. 434). Accordingly, there is no evidence to support the plaintiff's claim that his sleep apnea limited his ability to perform work at a medium exertional level.

The plaintiff argues also that the ALJ's RFC "should have included limitations as to [the plaintiff's] ability to interact with coworkers and the public." (Pl.'s Mem. at 14). The medical record certainly reflects the plaintiff's past issues with hygiene and his history of "annoying"

8

others, but, as reflected in her decision, the ALJ considered the plaintiff's mental health impairments before concluding they were not severe. (Tr. 24).

The plaintiff's mental health records began on November 4, 2014, when he underwent a Mental Health Psychosocial Assessment at the VA. (Tr. 645-48). The plaintiff presented with an appropriate affect and mood, and he was observed to have "proper hygiene and was dressed appropriately for the cooler weather." (Tr. 647). He was cooperative and his speech was logical and coherent. (Tr. 647). Additionally, the VA records reflect that the plaintiff could complete his ADLs and IADLs (instrumental activities of daily living, such as managing finances and paying bills) independently. (Tr. 647). On the same day, he went through a mental health intake to qualify for Homes for the Brave. (Tr. 649-58). At that time, he was homeless and staying with a friend in Ansonia. (Tr. 659). On November 14, 2014, VA staff noted that plaintiff's appearance was "appropriate but with some occasional inflexibility in his demeanor[.]" (Tr. 403).

The plaintiff was seen by Dr. Meaghan A. Stacy,[3] and Natalie Hung for a Mental Health Psychiatric Consult on December 1, 2014. (Tr. 371-75, 614-18). His "presenting chief complaint" was: "I'm not a nutso." (Tr. 371, 614). The plaintiff reported that his depressed mood improved after adjustments to his economic and living situation. (Tr. 371, 614). Dr. Stacy's diagnostic impression was adjustment disorder with depressed mood, rule out unspecified depressive disorder. (Tr. 374, 617). Dr. Stacy noted that, since the plaintiff was "not currently interested in mental health treatment," no follow up appointments were set, but that if his depressed mood returned "after his psychosocial stressors remit, more assessment may be needed to determine whether or not there [was] an underlying depressive disorder." (Tr. 374, 617).

---

[3] The report is signed by Meaghan A. Leddy, Ph.D. (Tr. 375, 618).

On December 15, 2014, the plaintiff sought assistance in finding permanent housing; his ability to maintain his IADLs was noted. (Tr. 610).

On December 17, 2014, the plaintiff was "neatly dressed, showered and . . . very excited to share all the positive news in his life." (Tr. 605-06). Three months later, however, the plaintiff's case manager at Homes for the Brave requested that the plaintiff be re-evaluated for mental health services due to an "increased number of behavioral outbursts at the program over the past [two] months." (Tr. 337, 485, 576, 799). The plaintiff exhibited "low frustration tolerance towards peers and staff when [he was] confronted [regarding] his personal hygiene (at times poor ADLs in terms of having clean clothes and body odor) and talkative personality (which annoys peers in group settings)." (Tr. 337, 485, 576, 799). The request noted that there was a "correlation with high [blood sugar] levels and [the plaintiff's] depressed and agitated mood." (Tr. 337, 485, 576, 799).

On April 6, 2015, the plaintiff presented to the VA without an appointment, dressed in "multiple layers and a heavy winter coat – overdressed for the weather[,]" looking "greasy" with poor hygiene and body odor. (Tr. 481, 572, 796). He was referred to mental health services for "behavioral outbursts with staff when confronted about his 'hygiene and talkative personality[.]'" (Tr. 482, 573, 797). He reported, "I'm not nuts, Homes for the Brave told me to come here." (Tr. 482, 573). He also said that he was "sleeping without [a] problem" and described himself as "happy go lucky" but admitted having a "short fuse." (Tr. 482, 573). The plaintiff was not interested in mental health treatment. (Tr. 482, 573; *see also* Tr. 484, 575).

By May 2015, the plaintiff appeared much as he had back in November 2014. On May 1, 2015, the plaintiff and his case manager met with Maryellen Leigh, LSCW for a program service plan review. (Tr. 479-80, 570-71, 794-95). The plaintiff "presented with clean clothes, was clean shaven and recently showered." (Tr. 480, 570, 794). The plaintiff "needed prompts to stay focused

on topic of discussions as his responses were long winded." (Tr. 480, 571, 794). Leigh noted that they discussed personal hygiene with the plaintiff and that he was complimented on his appearance that day, which was a "significant improvement from [that] morning." (Tr. 480, 571, 794).

In a December 14, 2015 Depression Screen, the plaintiff reported no indications of being depressed. (Tr. 680-81). Specifically, he reported "not at all" in response to inquiries of whether he had little interest or pleasure in doing things, and whether he felt down, depressed or hopeless. (Tr. 680-81). As the ALJ stated in her decision, the plaintiff did not take any anxiety-control or antidepressant medications, and he declined further mental health treatment. (Tr. 24, 26).

In addition to the records from the VA, the ALJ had the benefit of a Psychiatric Review Technique completed by Kirk Johnson, PsyD, dated October 6, 2015. (Tr. 70-71). Dr. Johnson concluded that the plaintiff had no restrictions in his activities of daily living, mild difficulties maintaining social functioning, and no difficulties in maintaining concentration, persistence or pace. (Tr. 61, 70).

Cumulatively, there is nothing in the record that counters the ALJ's conclusion that the plaintiff could perform medium work subject to her stated limitations. The plaintiff's contention that that the ALJ erred in failing to obtain a functional assessment from the plaintiff's providers at the VA, fails for two reasons. First, the SSA's Program Operations Manual System ["POMS"] Section SI 22505.007 explains, "As a matter of policy, the VA does not permit its physicians and psychologists to provide" a statement of medical opinion. https://secure.ssa.gov/apps10/poms.nsf/lnx/0422505007 (last visited Sept. 10, 2019). Second, the ALJ is not obligated to seek additional information where "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.,* 521 F. App'x 29, 34 (2d Cir. 2013).

In addition to reviewing the dozens of treatment records from the VA reflecting regular medical treatment, the ALJ had the benefit of the opinions of the State agency medical consultants, who reviewed the VA medical records. Specifically, on October 6, 2015, Dr. Carl Bancoff completed a Physical Residual Functional Capacity Assessment of the plaintiff in connection with his application for benefits. (Tr. 62-64, 71-73). He based his decision upon review of 373-pages of medical records from the VA. (*See* Tr. 60, 69). Dr. Bancoff opined that the plaintiff could occasionally lift and/or carry up to fifty pounds; frequently lift and/or carry up to twenty-five pounds, and, stand, walk and sit for about six hours in an eight-hour day. (Tr. 63, 72). He noted that the plaintiff had environmental limitations such that he must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (Tr. 63-64, 72-73).

The ALJ did not reference this opinion in his record, but he did discuss the February 3, 2016 Physical Residual Functional Capacity Assessment completed by Dr. Robert Mogul. (Tr. 24). Dr. Mogul reached many of the same conclusions as Dr. Bancoff, with the exception of finding that, in addition to avoiding concentrated exposure to fumes, odors, dusts, gases and poor ventilation, the plaintiff should avoid concentrated exposure to extreme cold, heat, humidity, vibration and hazards. (Tr. 83-84, 91-93). As the ALJ noted, Dr. Mogul also had the benefit of the medical records from the VA, and the ALJ cited Dr. Mogul's assessment in conjunction with these consistent VA records. (Tr. 24). Specifically, the records reflecting the plaintiff's long history of smoking and his consistent treatment for COPD revealed that, although the plaintiff had nodules in his lungs (Tr. 314-15), he, as the ALJ noted, underwent several routine lung function tests, none of which were "indicative of listing severity." (Tr. 24; *see* Tr. 313, 412, 664-65, 807; *see also* Tr. 890 (January 2016: no evidence of acute cardiopulmonary disease), 889). Bearing this history in

mind, the ALJ incorporated Dr. Mogul's more restrictive findings into her RFC determination. (Tr. 25).

"The ALJ is entitled to rely on the opinions of both examining and non-examining State agency medical consultants, because those consultants are deemed to be qualified experts in the field of social security disability." *Wilson v. Saul*, No. 3:18-CV-01097 (WWE), 2019 WL 2603221, at *11 (D. Conn. Jun. 25, 2019) (citing 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(e), 416.912(b)(6), 416.927(e); *Frye ex rel. A.O. v. Astrue*, 485 F. App'x. 484, 487 (2d Cir. 2012) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record.")). As discussed at length above, in addition to relying on the State agency opinions, the ALJ relied on the plaintiff's treatment records from the VA. After considering all of the medical evidence, the ALJ reached an RFC determination supported by substantial evidence in the medical record. *See* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(A) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . ., the final responsibility for deciding these issues is reserved to the Commissioner."). As the Second Circuit has held, "[t]he substantial evidence standard means once an ALJ finds facts, [the reviewing court] can reject those facts only if any reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Adm., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citations and internal quotations omitted). Under the facts of this case, including the detailed medical record and the State Agency opinions, the Court concludes that the ALJ's decision that the plaintiff was capable of performing work at the medium exertional level is supported by substantial evidence.[4]

---

[4]This conclusion renders moot the plaintiff's argument that the ALJ erred in failing to limit the plaintiff to work at a light exertional level which would direct a finding of disabled under the Medical-Vocational Guidelines. (Pl.'s Mem. at 16-17).

B. THE ALJ DID NOT ERR AT STEP FIVE

The plaintiff bears the burden of proving disability at the first four steps of the sequential analysis. At step four, the ALJ concluded that the plaintiff was unable to perform any past relevant work. (*See* Tr. 27; *see* 20 C.F.R. §§ 404.1565 and 416.965). The burden then shifted to the Commissioner to show that the plaintiff could perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). At the hearing, the ALJ asked the vocational expert if there were jobs in the national economy that a hypothetical individual with the plaintiff's vocational profile and RFC could perform. (Tr. 54-55). Matching the hypothetical posed by the ALJ, the vocational expert testified that a person limited to medium work but with the ability to frequently climb ramps and stairs, occasionally climb ladders and scaffolds, frequently balance, stop, kneel or crouch, occasionally crawl, and avoid concentrated exposures to temperature extremes, humidity, vibrations and respiratory irritants, could perform jobs as a laundry worker II (Dictionary of Occupational Titled ["DOT"] code of 361.685-018, with approximately 40,000 jobs nationally), dishwasher (DOT code 318.687-010, with approximately 300,000 jobs nationally), and lumber sorter (DOT code 922.687-074m with approximately 15,000 jobs nationally). (Tr. 54-55); *Priel v. Astrue*, 453 F. App'x 84, 87 (2d Cir. 2011) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983) (stating that it is proper for the ALJ to "decline[] to include in his hypothetical question" posed to a vocational expert, "symptoms and limitations that he had reasonably rejected."); *see Mancuso v. Astrue*, 361 F. App'x 176, 179 (2d Cir. 2010) (citing *Dumas,* 712 F.2d at 1553-54) ("The Commissioner may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence.")).

The plaintiff argues that he could not perform the work of a laundry worker II or dishwasher because both jobs require "frequent environmental exposure[,]" namely exposure to extreme heat and exposure to wetness/humidity. (Pl.'s Mem. at 18). According to the plaintiff, "[b]ecause the ALJ limited [the plaintiff] to 'no concentrated exposure' or only occasional, or less, exposure to 'temperature extremes [and] humidity[,]'" among others, the plaintiff could not perform these two jobs with his RFC as described by the ALJ. (Pl.'s Mem. at 18).

The term "concentrated exposure" is not defined, and the Court cannot find support for the plaintiff's argument that avoiding concentrated exposure is equal to only allowing occasional exposure. The plaintiff cites to Form SSA-4734-BK, which is a blank form for completing a Physical Residual Functional Capacity Assessment. *See* https://secure.ssa.gov/apps10/poms/images/SSA4/G-SSA-4734-BK-1.pdf (last accessed September 12, 2019). The form includes four check boxes ranging from "unlimited[,]" to "avoid concentrated exposure[,]" to "avoid even moderate exposure[,]" to "avoid all exposure[.]" *Id.* at 5.[5] This form, therefore, suggests that "avoid concentrated exposure" is the least restrictive limitation, with the next option being no restriction. *Id.* Thus, the plaintiff is incorrect in his contention that the vocational expert's testimony conflicts with the DOT.

---

[5]

F. ENVIRONMENTAL LIMITATIONS

☐ None established. (Proceed to section II.)

| | UNLIMITED | AVOID CONCENTRATED EXPOSURE | AVOID EVEN MODERATE EXPOSURE | AVOID ALL EXPOSURE |
|---|---|---|---|---|
| 1. Extreme cold | ☐ | ☐ | ☐ | ☐ |
| 2. Extreme heat | ☐ | ☐ | ☐ | ☐ |
| 3. Wetness | ☐ | ☐ | ☐ | ☐ |
| 4. Humidity | ☐ | ☐ | ☐ | ☐ |
| 5. Noise | ☐ | ☐ | ☐ | ☐ |
| 6. Vibration | ☐ | ☐ | ☐ | ☐ |
| 7. Fumes, odors, dusts, gases, poor ventilation, etc. | ☐ | ☐ | ☐ | ☐ |
| 8. Hazards (machinery, heights, etc.) | ☐ | ☐ | ☐ | ☐ |

Moreover, the "Commissioner need show only one job existing in the national economy that [the plaintiff] can perform[,]" and the plaintiff does not dispute that the job of lumber sorter does not expose the plaintiff to any of the environmental limitations. *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (citing 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(b)). The plaintiff, however, argues that the vocational expert's estimate of 15,000 lumber sorter jobs nationally is incorrect. (Pl.'s Mem. at 19). According to the plaintiff, Bureau of Labor Statistics' Appendix 2 states that there are only 441 lumber sorter jobs across the country, and just 6 in Connecticut. (Doc. No. 17-3). Conversely, the defendant points out that the Bureau of Labor Statistic's website shows that the lumber sort job belongs to a larger group of Inspectors, Tester, Sorters, Sampler, and Weighers (SOC/OES group), and that such group has 557,510 jobs nationally, with 7,930 in Connecticut. (Def.'s Mem. at 16) (citing https://www.bls.gov/oes/current/oes519061.htm (last visited Sept. 12, 2019)). Clearly the number of jobs available depends on the source consulted.

The ALJ may rely on evidence from a vocational expert that is derived from the Dictionary of Occupational Titles, as well as other reliable publications. 20 C.F.R. §§ 404.1566(d)-(e), 416.966(d)-(e); *see Axon v. Berryhill*, No. 3:17 CV 604 (WWE), 2018 WL 1082401, at *3 (D. Conn. Feb. 28, 2018). In this case, the ALJ relied on the vocational expert's testimony, based on the Dictionary of Occupational Titles, that 15,000 jobs existed nationally, and the plaintiff's counsel did not question that number at the hearing. The ALJ fulfilled her burden at step five by identifying three jobs that the plaintiff could perform in the national economy.

VI.     CONCLUSION

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 17) is *denied*, and the defendant's Motion to Affirm (Doc. No. 20) is *granted.*

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

Dated this 18th day of October, 2019 at New Haven, Connecticut.

    /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge